RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 3 / 3 / 14

UNITED STATES DISTRICT COURT          b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


CHARLES DAVID GILLESPIE,          CIVIL ACTION
          Appellant          1:13-CV-00219

VERSUS

MICHAEL ASTRUE, COMMISSIONER          JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,          MAGISTRATE JUDGE JAMES D. KIRK
          Appellee


<u>REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE</u>

Charles David Gillespie ("Gillespie") filed an application for disability insurance benefits ("DIB") on December 17, 2010 alleging a disability onset date of May 13 , 2010 (Tr. p. 135) due to "back injury and depression" (Tr. p. 168).  That application was denied on February 3, 2011 (Tr. p. 94).

A de novo hearing was held before an administrative law judge ("ALJ") on August 15, 2011, at which Gillespie appeared with his attorney and a vocational expert ("VE") (Tr. p. 38).  The ALJ found that Gillespie suffers from severe impairments of "disc bulge with annular tear at L4-5, degenerative disc disease at L5-S1, mild nerve irritability, chronic pain syndrome, and depression."  The ALJ concluded that Gillespie has the residual functional capacity to perform the full range of sedentary work, except that he must alternate periods of sitting and standing/walking every twenty minutes, and is limited to work involving understanding, remembering and carrying out only short, simple and uninvolved

instructions and simple repetitive tasks in an environment free of fast-paced production quotas (Tr. pp. 22, 24). The ALJ concluded that Gillespie can perform work that exists in significant numbers in the national economy such as addresser and telephone quotation clerk and, therefore, was not under a disability within the meaning of the Social Security Act at any time from his alleged disability onset date of May 13, 2010 through the date of the ALJ's decision on October 28, 2011 (Tr. p. 28).

Gillespie requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Gillespie next filed this appeal for judicial review of the Commissioner's final decision. Gillespie raises the following issues for review on appeal (Doc. 12):

> 1. The vocational testimony failed to satisfy the <u>Daubert</u> standard for non-scientific expert testimony as explained in <u>Kumho Tire Company v. Carmichael</u>, 526 U.S. 137, 147-151, 119 S.Ct. 1167 (1999).

> 2. Even if the District Court determines that <u>Daubert</u> does not apply to Social Security hearings, the ALJ's decision violates the agency's policy of refraining from reliance on vocational testimony which is unreliable.

> 3. The explanation requirement embodied in 42 U.S.C. § 405 is invoked here, given the ALJ's acceptance of expert testimony when the expert is unable to cite any source for his opinion about the numbers of jobs other than his years of experience.

The Commissioner filed a brief in response (Doc. 13), to which Gillespie replied (Doc. 14). Gillespie's appeal is now before the court for disposition.

2

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. 416(i), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

When he filed his social security application in December 2010, Gillespie was 44 years old, had a tenth grade education, and had past relevant work as a delivery driver for a horticultural supply company (1996-2004) and as a sales clerk for a horticultural supply company (2005-2010)(Tr. pp. 169, 195).

### 1. Medical Records

In December 2008, Gillespie was evaluated by Dr. Stephen Katz, an anesthesiologist, for management of his intervertebral disc disease; Dr. Katz continued his Roxicodone and prescribed back stretching exercises, stating he believed much of Gillespie's discomfort is due to deconditioning (Tr. p. 336).  Dr. Katz believed Gillespie was at maximum medical improvement and needed

3

more conditioning (Tr. p. 336).  In March and June 2009, Dr. Katz continued Gillespie's prescriptions for OxyContin and Percocet and strongly encouraged him to exercise as much as possible (Tr. p. 335).  Dr. Katz also prescribed a Medrol Dosepak (Tr. p. 334).

In July and October 2009 and January and April 2010, Gillespie returned to see Dr. Katz, who noted the diagnosis of intervertebral disc disease and an anular tear at L4-5; Gillespie reported doing well with his increased medication dosages for OxyContin and Roxicodone (Tr. pp. 235-238).

In May 2010, Dr. Katz noted Gillespie's ongoing complaints of lower back pain with lumbar radiculopathy, with his pain being grater on the left than on the right side and radiating primarily into both lower extremities in the distribution of L4 and L5 (Tr. p. 239).  Dr. Katz noted that Gillespie had worked for a while, but was no longer able to do so, continued his Oxycontin, Roxicodone, and Neurontin, prescribed a Medrol Dosepak, and ordered another MRI (Tr. p. 239).

In August 2010, Dr. Katz wrote that Gillespie's recent MRI (Tr. pp. 240-241) showed mild facet arthropathy with an anular tear at L4-5, and no central or foraminal stenosis (Tr. p. 234).  Due to his continued pain, Dr. Katz discontinued Gillespie's OxyContin and Roxicodone, and prescribed MS-Contin and Voltaren; Dr. Katz noted that Neurontin and a Medrol Dosepak had not helped (Tr. p. 234).  Dr. Katz also ordered that an EMG/NC5 be undertaken to rule out neuropathy (Tr. p. 234).  Dr. Katz also referred Gillespie to Dr. Quillin for assistance with coping skills (Tr. p. 234).  Dr. Katz

noted there was "some discrepancy with regards to [Gillespie's] return to work status in a sedentary position" and planned to discuss his job description with his workers' compensation adjuster (Tr. p. 234).

Gillespie was evaluated by Dr. Mohammad Shbeeb, a rheumatologist, in September 2010 for his complaints of low back pain and facet syndrome (Tr. p. 231).  Dr. Shbeeb noted that Gillespie was 5'11" tall, weighed 221 pounds, and his blood pressure was 151/94; he reported gaining thirty pounds in the last five years (Tr. p. 231).  Dr. Shbeeb found that Gillespie's original MRI of his lumbar spine showed diffuse degenerative disc disease with mild broad-based, circumferential bulging of the L4-L5 disc but without significant neural foraminal or spinal stenosis and the facets at that level were maintained (Tr. p. 231).  Dr. Shbeeb further found that Gillespie had worsening pain for two years with difficulty squatting and climbing; his repeat MRI in 2010 showed stable findings with unchanged, small central and right paracentral protrusion, an annular tear, no evidence of neural compromise, and facet arthritis at L5-S1 with bilateral pars defect at L5 (Tr. p. 231).  Gillespie's previous treatments included epidural steroid injection, physical therapy, and branch block, none of which were effective (Tr. p. 231).  Gillespie had diffuse paraspinal tenderness, tenderness at the lower lumbar spine, and his range of motion was somewhat restricted secondary to pain (Tr. p. 231).  Dr. Shbeeb diagnosed a longstanding history of lower back pain, degenerative arthritis, facet arthritis, and bulging disc at

5

L4-5 without evidence of inflammatory arthritis and connective tissue disease, and recommended that Gillespie continue chronic pain management with Dr. Katz, injections and neurosurgical evaluation as deemed necessary (Tr. p. 231).

Gillespie's EMG and nerve conduction studies in October 2010 showed mild chronic nerve root irritability, mainly left L5, but no active denervation to indicate active radiculopathy (Tr. pp. 242, 339).   Also in October 2010, Dr. James Quillin, a medical psychologist, noted Gillespie's history of chronic low back pain caused by an occupational injury in 2003; when Gillespie pulled on a pallet jack at work, he injured his back (Tr. p. 249).   Gillespie reported that he initially saw his family doctor, but was eventually referred to neurosurgery where he saw Dr. Drerup; when it was determined that Gillespie was not a surgical candidate, he was referred to Kr. Katz for pain management (Tr. p. 249). Although MRI's showed degenerative changes, Dr. Shbeeb found Gillespie does not have rheumatoid arthritis, Dr. Hajmurad found he has nerve damage in the L5 distribution, and Dr. White recommended a nerve root block, which was undertaken but did not provide much relief (Tr. p. 249).   Dr. Quillin found that Gillespie had developed depressive features (doesn't sleep well, low energy level, isolation, episodic suicidal thoughts), and was taking Lotrel, Oxycodone, and OxyContin (Tr. p. 249).   Dr. Quillin diagnosed a moderate single episode of major depression secondary to chronic pain, and chronic pain syndrome secondary to occupational injury (Tr. p. 250). Dr. Quillin prescribed Lexapro

(Tr. p. 250).

In November 2010, Gillespie told Dr. Quillin he was only taking the Lexapro sporadically because it was causing nausea, so Dr. Quillin advised him to take it at night (Tr. p. 248).   In December 2010, Gillespie reported tolerating the low dose Lexapro better, so his dosage was increased (Tr. pp. 247, 255).

Gillespie began behavioral pain management treatment with biofeedback in January 2011, with Dr. Quillin (Tr. pp. 275-292). Later in January 2011, Dr. Quillin noted that Gillespie felt the behavioral pain management was helpful even at that early stage, reduced Gillespie's Lexapro due to side effects, and tried adding Deplin (Tr. p. 288).   Dr. Quillin diagnosed a moderate single episode of major depression secondary to chronic, chronic pain syndrome secondary to occupational injury and poor functional status (Tr. p. 288).

In February 2011, Dr. Quillin noted that Gillespie had a "more adequate functional status," but was suffering from vertigo and encouraged him to see his family doctor for that (Tr. p. 281). When Gillespie completed the pain management treatment course in March 2011, he indicated he was doing much better in managing his chronic pain, even with flare-ups, and his mood status was much better (Tr. p. 275), and Dr. Quillin reviewed relapse prevention strategies with Gillespie (Tr. p. 274).   In April 2011, Gillespie's mood status was improving, his post-treatment psychologic studies indicated mild depression of a physiologic nature with mild somatization, and he was in hybrid pain adjustment with a

substantial adaptive component (Tr. pp. 273-274).  Gillespie's
Lexapro prescription was continued (Tr. p. 273).

In July 2011, Dr. Katz diagnosed intervertebral disc disease
and failed back syndrome, continued Gillespie's OxyContin and
Roxicodone prescriptions, prescribed Lyrica, and discussed the
possibility of him using a spinal cord stimulator (Tr. p. 363).
Also in July 2011, Dr. Quillin found Gillespie's weight had
increased to 244 pounds, his mood status was "in recovery," he had
improved functional status, and his Lexapro prescription was
continued (Tr. p. 362).

In August 2011, Dr. Katz noted Gillespie seemed to be doing
well and had no major complaints of discomfort other than pain over
the last three days, but stated that Gillespie needed to try to
exercise as much as possible because it would help control his
discomfort (Tr. p. 361).

### 2. August 2011 Administrative Hearing

At his August 15, 2011 administrative hearing, Gillespie
testified that he has a tenth grade education and did not earn a
GED, is divorced, his sons (15 and 16 years old) stay with him two
to three nights a week (when they are not with their mother), and
he lives in a mobile home (Tr. p. 47).  Gillespie testified that he
is six feet tall and weighs about 220 pounds (Tr. p. 47).

Gillespie testified that he last worked in May 2010, doing
inside sales (Tr. p. 48).  Gillespie testified that he began
working inside sales after he was injured, in about 2005 or 2006;
that job involved stocking shelves, waiting on customers, cleaning

the showroom, stocking the showroom, and "UPS" (Tr. pp. 47-48). Gillespie testified that he dealt with nursery supplies, chemicals, and fertilizers (Tr. pp. 48-49). Gillespie testified that, on a typical work day as a salesman, he would sit for about four hours and be on his feet about five hours; he usually worked about nine hours a day (Tr. p. 49). The heaviest weight Gillespie would lift and carry was about ten pounds (Tr. p. 49). Gillespie testified that he did lighter duty work after he injured his back (Tr. p. 51).

Gillespie further testified that, before he was injured, he was a truck driver, which involved loading his truck, delivering the merchandise, and unloading the truck, several times a day (Tr. p. 50). Gillespie testified that he had to climb in and out of his truck (Tr. p. 65), and the heaviest weight he lifted and carried as a driver was about fifty pounds; he used a pallet jack to haul 2000 pound pallets (Tr. p. 50). Gillespie testified that he spent about half of his time driving and the other half loading and unloading (Tr. p. 50). Gillespie testified that those were the only two jobs he had in the last fifteen years (Tr. p. 50).

Gillespie testified that he stopped working because he had more pain than he could deal with (Tr. p. 51). Gillespie testified that he has a constant, sharp, burning pain in his back that varies but never goes away (Tr. p. 51). Gillespie testified that his pain worsens sometimes but medication eases it (Tr. p. 52). Gillespie testified that his pain worsens when he walks or stands, and that his pain is 10/10 when it is at its worst and 5/10 when he is

9

feeling good (Tr. p. 53). Gillespie testified that his pain is at
its worst about four days per month, is at its best about fifteen
days per month, and is somewhere in between the remaining days of
the month (Tr. p. 53).

Gillespie testified that his pain goes down both legs to his
feet sometimes, but mostly just down the left leg (Tr. p. 54).
Gillespie testified that he has seen Dr. Katz for pain management
since 2005 (Tr. p. 55). Gillespie testified that he has had
fifteen epidural steroid injections, three nerve blocks, and
physical therapy; he had the nerve blocks in 2009 or early 2010 and
the steroid injections in 2006 and 2007 (Tr. p. 57). Gillespie
testified that he takes OxyContin, Roxicodone, and Levitra, and
that they make him sleepy and sometimes makes his vision blurry
(Tr. p. 59).

Gillespie testified that, if he stands for ten to fifteen
minutes, he starts hurting in his lower back to his legs and has to
sit down (Tr. pp. 59-60). Gillespie testified that he can walk
about fifty to 75 yards, which would take him three or four minutes
(Tr. p. 60). Gillespie testified that he uses a cane to prevent
him from falling down, but the doctor did not prescribe it for him;
he has fallen several times (Tr. p. 60). Gillespie testified that
he can walk fifty to 75 yards without the cane but prefers to use
it (Tr. p. 61). Gillespie also testified that he can lift and
carry ten pounds, such as milk or a small bag of groceries (Tr. p.
61). Gillespie testified that he can sit for a while, but has to
change positions if he starts hurting; he can sit in one position

10

for five to ten minutes without having to move (Tr. p. 61).
Gillespie further testified that stooping, bending from the back to
pick something up off the floor, or touching his knees would be
greatly problematic (Tr. p. 81).

Gillespie testified that, on a typical day, he reads and
watches TV (Tr. p. 62). When he gets up in the morning, Gillespie
takes a shower (he can bathe himself) and dresses himself; he has
some trouble with shoes and socks, so he uses slip-on shoes (Tr. p.
62). Gillespie can cook a little, but usually just makes a
sandwich for lunch and his mother fixes his evening meal (Tr. p.
62). Gillespie also testified that his mother cleans his home
about once a week; his mother is almost 70 years old (Tr. p. 63).
Gillespie buys his own groceries and drives himself to the store
(Tr. p. 63). Gillespie testified that he can drive for about 20 to
25 miles but is very stiff afterward (Tr. p. 64). Gillespie
testified that he does not drink, smoke, or use illegal drugs (Tr.
pp. 64-65).

Gillespie testified that, if he were offered a job where he
could get up whenever he wanted and did not have to do much
lifting, but had to work eight hours per day, five days per week,
he would have to be able to lay down during the day after he takes
his medicine because it makes him sleepy (Tr. p. 65); both the
OxyContin and the Roxicodone are narcotics that make him sleepy and
unable to concentrate and think clearly for about two hours after
he takes them (Tr. p. 66). Gillespie takes the OxyContin and
Roxicodone each three times per day, not at the same times, so he

11

is drowsy six times per day (Tr. p. 67).  Gillespie testified that
he needs to lay down four to six hours during the day (Tr. p. 66)
and, if he could not lay down during the day, his pain would
increase to 9/10 or 10/10 (Tr. p. 68).

Gillespie testified that Dr. Katz wants to try some other
things for his pain because his medications become less effective
over time (Tr. p. 67).

Gillespie also testified that Dr. Quillin is treating him for
depression because not being able to work makes him feel bad, and
the last time he had suicidal thoughts was a month ago (Tr. pp. 68-
69).  Gillespie testified that Lexapro helps his depression (Tr. p.
69).  Gillespie also testified that he does not sleep well at night
because he wakes up hurting and has to move around, but his
appetite is fine and he has gained weight since he stopped working
(Tr. p. 70).  Gillespie testified that he avoids people due to his
depression, and he has trouble paying attention because of his
medications (Tr. p. 72).

The VE[1] testified that Gillespie's past relevant work as a
"sales attendant" is light duty, SVP 2, DOT[2] 229.677-010 (Tr. p.
74), and his past relevant work as a delivery driver is medium
duty, SVP 4 or semi-skilled, and DOT 904.663-014 (Tr. p. 74).  The

---

[1] The only name provided for the VE is "Mr. Rousy;" that
name is apparently badly misspelled and is not listed in the
licensee database for Louisiana licensed vocational
rehabilitation counselors, at http://www.lrcboard.org/
licensee_database.asp.  The ALJ noted that the VE's curriculum
vitae is "on file with the agency" (Tr. pp. 72-73).

[2] Dictionary of Occupational Titles, published by the
Department of Labor.

VE also testified that Gillespie's work skills are not transferrable into sedentary work (Tr. p. 81).

The ALJ posed a hypothetical involving a person of Gillespie's age, education, and work experience, who can do sedentary work but needs to change positions from sitting to standing every twenty minutes (Tr. p. 74). The VE testified that such a person could not do his past relevant work, but could work as an addresser (sedentary, SVP 2, DOT 209.587-010, 139,000 jobs in the United States, 2000 jobs in Louisiana), telephone quotation clerk (sedentary, SVP 2, DOT 237.367-046, 1.1 million jobs in the United States, 16,600 jobs in Louisiana), or assembler (sedentary, SVP 2, DOT 734.687-018, 289,000 jobs in the United States, 6200 jobs in Louisiana). The VE stated that the Dictionary of Occupational Titles does not recognize or address a sit/stand option, but he considered that factor in stating the numbers of jobs (Tr. p. 75).

The ALJ posed a second hypothetical, again involving a person of Gillespie's age, education, and work background, who can do sedentary work, but who needs to change positions from sitting to standing every twenty minutes, with the additional limitation that the person would experience side-effects from medication resulting in concentration deficits such that the person would be off task 25 percent of a typical day (Tr. p. 76). The VE testified that such a person would be unemployable (Tr. p. 76) and could not do his past relevant work (Tr. p. 77).

The ALJ posed a third hypothetical, again involving a person of Gillespie's age, education, and work background, who can do

sedentary work but needs to change positions from sitting to standing every twenty minutes, and who experiences deficits in concentration, persistence and pace from depression which would limit him to understanding, remembering, and carrying out only simple, uninvolved instructions that are not complex or detailed, and would be limited to performing simple and repetitive work-related activities in a work environment without fast-paced production requirements (Tr. p. 76). The VE testified that such a person would not be able to do the assembler job and could not do his past relevant work, but could work as an addresser or a telephone quotation clerk (Tr. p. 77).

The ALJ posed a fourth hypothetical, again involving a person of Gillespie's age, education, and work background, who can do sedentary work but needs to change positions from sitting to standing every twenty minutes, and who experiences deficits in concentration, persistence and pace from depression which would limit him to understanding, remembering, and carrying out only simple, uninvolved instructions that are not complex or detailed, and would be limited to performing simple and repetitive work-related activities in a work environment without fast-paced production requirements and, additionally, who would be able to have only occasional exposure to co-workers and no contact with the general public (Tr. p. 77). The VE testified that such a person could not do his past relevant work and could not work as a telephone quotation clerk, but could work as an addresser.

The VE testified that his testimony was inconsistent with the

14

Dictionary of Occupational Titles only as to the sit/stand option, so his opinion as to that came from his professional experience (Tr. p. 78).  The VE explained that he did not have any studies or empirical data or research to back up his opinion as to jobs involving a sit/stand option, but he relied on his experience in job analysis, job placement, and labor market surveys (Tr. pp. 78-79).

The VE further testified that the job of addresser involved putting labels on envelopes which, to the VE's knowledge, did not have a job production quota (Tr. p. 79), but would have a performance requirement (Tr. p. 80).  The VE testified that, if the claimant lost concentration or was unable to be on task for 25 percent of the time, he would not be able to do any job (Tr. p. 79).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Gillespie (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and

15

terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Gillespie has not engaged in substantial gainful activity since May 13, 2010 (Tr. p. 22), and that he has "severe impairments" of disc bulge with annular tear at L4-5, degenerative disc disease at L5-S1, mild nerve irritability, chronic pain syndrome, and depression, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 22).  The ALJ also found that Gillespie is unable to perform his past relevant work as a delivery driver and a sales attendant (Tr. p. 27).

At Step No. 5 of the sequential process, the ALJ further found that Gillespie has the residual functional capacity to perform the full range of sedentary work except that he must alternate periods of sitting and standing/walking every twenty minutes, and is limited to work involving understanding, remembering and carrying out only short, simple and uninvolved instructions and simple

repetitive tasks in an environment free of fast paced production quotas (Tr. p. 24). The ALJ found that the claimant is a younger individual with a limited education, and the transferability of work skills is not relevant to the disability determination (Tr. p. 27). The ALJ concluded there are a significant number of jobs in the national economy which Gillespie can perform, such as addresser and telephone quotation clerk and, therefore, Gillespie was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on October 28, 2011 (Tr. pp. 27-28).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly

detracts from its weight.  <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law.  <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Daubert</u>

First, Gillespie contends the vocational testimony failed to satisfy the <u>Daubert</u> standard for non-scientific expert testimony as explained in <u>Kumho Tire Company v. Carmichael</u>, 526 U.S. 137, 147-151, 119 S.Ct. 1167 (1999).

The Federal Rules of Evidence do not apply in Social Security

proceedings.[3]  Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure.  42 U.S.C. § 405; 20 C.F.R. §§ 404.950(c), 416.1450(c).  Also, <u>Richardson v. Perales</u>, 402 U.S. 389, 400-01, 91 S.Ct. 1420 (1971).  Vocational experts testifying in benefits hearings must generally identify the sources they have consulted in reaching their conclusions, but they are under no obligation to identify with greater specificity the source of their figures or to provide supporting documentation.  The ALJs who conduct SSA hearings have no <u>Daubert</u> gate-keeping duty for vocational expert testimony.  <u>Brault v. Social Sec. Admin.</u>, 683 F.3d 443, 449-450 (2d Cir. 2012).  Also, <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 n.4 (9th Cir. 2005)("a VE's recognized expertise provides the necessary foundation for his or her testimony"); <u>Gangelhoff v. Apfel</u>, 2000 wl 34032675 (N.D. Iowa 2000)("It must be remembered that a Social Security administrative hearing is a non-adversarial hearing, whereas the <u>Daubert</u> standard applies to adversarial proceedings where the Federal Rules of Evidence apply.  Therefore,... the <u>Daubert</u> standard does not apply to the use of vocational expert testimony in a Social Security administrative hearing.").

Therefore, the ALJ did not have a duty to apply <u>Daubert</u> to the expert testimony received in Gillespie's administrative hearing. This issue is meritless.

---

[3] <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993), establishes the requirements for the admissibility of expert testimony under F.R.E. rule 702.

Issue 2 - Reliability of VE's Testimony and Explanation of Conflict

Next, Gillespie argues that, even if the District Court determines that Daubert does not apply to Social Security hearings, the ALJ's decision violates the agency's policy of refraining from reliance on vocational testimony which is unreliable.  Gillespie contends the VE's testimony was unreliable because it was based only on the VE's work experience, rather than on empirical data. Gillespie also argues that 42 U.S.C. § 405 requires an explanation of the conflict between the Dictionary of Occupational Titles and the VE's testimony.  Gillespie contends the ALJ erred in accepting the VE's expert testimony since the VE was unable to cite any source for his opinion about the numbers of jobs in the national and state economies except his years of experience in vocational rehabilitation.

Social Security Ruling 00-4p provides that adjudicators should identify and obtain an explanation for any conflicts between the VE's evidence and the Dictionary of Occupational Titles, and explain in their decision how any identified conflicts were resolved.  SSR 00-4p, 2000 WL 1898704 at *2.  See Haas v. Barnhart, 91 Fed.Appx. 942 (5th Cir.), cert. den., 543 U.S. 928, 125 S.Ct. 331 (2004).  To the extent there is any implied or indirect conflict between the vocational expert's testimony and the Dictionary of Occupational Titles, the ALJ may rely upon the vocational expert's testimony, provided that the record reflects an adequate basis for doing so.  All kinds of implicit conflicts are possible and the categorical requirements listed in the Dictionary of Occupational

Titles do not and cannot satisfactorily answer every such situation. <u>Carey v. Apfel</u>, 230 F.3d 131, 146 (5th Cir. 2000). The Fifth Circuit has adopted a middle ground approach, in which neither the Dictionary of Occupational Titles nor the vocational expert testimony is per se controlling; this permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs. <u>Carey</u>, 230 F.3d at 146.

In the case at bar, the ALJ stated in his decision that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (Tr. p. 28). However, at the hearing, both the VE and Gillespie pointed out that the Dictionary of Occupational Titles does not include or address a sit/stand opinion, and Gillespie asked the VE for an explanation as to why he believed Gillespie could perform work despite his need for a sit/stand option. The ALJ erred in stating the VE's testimony was consistent with the Dictionary of Occupational Titles and in failing to provide an explanation for the inconsistency that the VE pointed out at the hearing, as to the sit/stand option. However, Gillespie was not prejudiced by these errors.

In the case at bar, the VE stated that Gillespie could perform the jobs of addresser and telephone quotation clerk, despite his need for sit/stand option. Gillespie pointed out that the Dictionary of Occupational Titles does not include or address a sit/stand option in its job descriptions, and asked the VE for the

21

basis of his opinion.  The VE testified that he did not have any specific information such as studies, empirical data or research about the sit/stand option, but stated that he was relying on his job experience.  A VE's reliance on his work experience, or expertise, provides a reasonable basis for his testimony that resolves a conflict between a Dictionary of Occupational Titles job description and a claimant's residual functional capacity. Gillespie has not identified any other reason to indicate the VE's testimony was unreliable.

It is noted that, because the Dictionary of Occupational Titles does not include any discussion of sit/stand options as to any jobs, a VE's testimony is necessary to determine whether a claimant can perform a specified job if a sit/stand option is required.  The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specified job.  Fields v. Bowen, 805 F.2d 1168, 1171 (5th Cir. 1986), and cases cited therein.

As noted in Carey, the Dictionary of Occupational Titles provides the maximum requirements for every job, but does not purport to cover every situation and every degree of residual functional capacity.  The categorical requirements listed in the Dictionary of Occupational Titles do not and cannot satisfactorily

answer every situation. <u>Carey</u>, 230 F.3d at 146.  Hence, an ALJ's reliance on a VE's expert testimony may be reasonable.  Compare <u>Laurent v. Astrue</u>, 366 Fed.Appx. 559, 561 (5th Cir. 2010) (where there was no indication that the VE's testimony was unreliable, the VE's testimony, that a person limited to sedentary exertion who must alternate sitting and standing could perform the assembler job as the VE had seen it performed, provided substantial evidence to support the Commissioner's decision); <u>Carey</u>, 230 F.3d at 146 (the Fifth Circuit found that an apparent conflict between a Dictionary of Occupational Titles job description and the claimant's residual functional capacity was greatly mitigated by the VE's specific testimony that the claimant could perform the identified job with his residual functional capacity).

In the case at bar, the VE's testimony provides substantial evidence to support the Commissioner's finding that Gillespie has the residual functional capacity to perform the work of an addresser or a telephone quotation clerk.

Finally, Gillespie contends the VE did not explain the bases for the numbers of jobs he provided at the hearing.  However, Gillespie failed to question the VE about the job numbers at the hearing and should not raise it now.  See <u>Carey</u>, 230 F.3d at 146-147("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the Dictionary of Occupational Titles, and then present that conflict as reversible error, when the conflict was not deemed sufficient to

merit adversarial development in the administrative hearing"). Moreover, there is no indication that the numbers provided by the VE actually conflict with the Dictionary of Occupational Titles or any other data source[4]; the VE testified that Gillespie has the residual functional capacity to perform the jobs of addresser and telephone quotation clerk, despite his need to sit/stand every twenty minutes.  The VE specifically testified that he considered the sit/stand factor in stating the numbers of jobs (Tr. p. 75). Therefore, substantial evidence supports the ALJ's finding that work exists in significant numbers in the state and national economies which Gillespie can perform.

These issues are meritless.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Gillespie's appeal be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or

---

[4] VEs typically use the Dictionary of Occupational Titles published by the Department of Labor, the Standard Occupational Classification system published by the Department of Labor, and census reports published by the Bureau of Census; the SSA takes administrative notice of the job data in those publications, as well as others.  20 CFR § 404.1566.

response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of _____ 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE